IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JAMES C. SMITH | * | |
| Plaintiff(s) | * | |
| vs. | * | Civil Action No.   JFM-11-1589 |
| MIRANT MID-ATLANTIC, LLC | * | |
| Defendant(s) | * | |
| | ****** | |

MEMORANDUM

Plaintiff has instituted this action claiming that he was wrongfully discharged in violation of a clear mandate of public policy, as set forth in the Maryland Stationary Engineers Act.[1] Defendant has filed a motion for summary judgment. The motion will be granted.

I.

Defendant operates the Morgantown Power Generation Station in Newburg, Maryland. Lester Combs is the operations manager of the facility. Plaintiff's supervisor, a shift supervisor, is responsible for managing Control Room supervisors and reports to Combs. Control Room supervisors are responsible for supervising plant operators.

Plaintiff was employed by defendant as a Control Room supervisor. For some time, beginning in 2009, plaintiff complained that all shift supervisors and Control Room supervisors must have Grade I licenses under the Maryland Stationary Engineers Act, Md. Code Ann., Bus & Prof. §6.5-302(e)(4)(i)(1-3). On August 12, 2010, plaintiff and his immediate supervisor had a verbal altercation in the Control Room. There is a factual dispute as to exactly what was said during the course of this altercation. Defendant acknowledges the factual dispute but contends

---

[1] This action was originally filed in the Circuit Court for Charles County, Maryland and was removed to this court by defendant on the basis of the diversity of citizenship of the parties.

that it is immaterial to the present motion.  Plaintiff's employment was terminated on August 16, 2010.  Plaintiff alleges that his employment was terminated because he had made internal complaints about shift supervisors and Control Room supervisors not having Grade I licenses.  Defendant asserts that even if this is assumed to be true, the Maryland Stationary Engineers Act, upon which plaintiff bases his allegation, does not establish a clear mandate of public policy that shift supervisors and Control Room supervisors have a Grade 1 license.

II.

The Maryland Stationary Engineers Act "requires a statutory engineer license for anyone who provide[s] stationary engineer services."  Md. Code Ann., Bus. & Prof. Occup. § 6.5-301.  The Act, in turn, defines the term "provide stationary engineer services" as "to oversee the operation of a power plant, plant of machinery, or boiler, generating pressure of more than 15 psi and operating at 30 or more horsepower."  Md. Code Ann., Bus & Prof. Occup. §6.5-101(2)(f).

Section 6.5-302(e) of the Act further provides, in pertinent part:

*Grade 1 license* – A Grade 1 stationary engineer licensee may oversee the operation of a boiler that:

    (1) can operate at 500 or more horsepower;
    (2) is inspected in accordance with the boiler laws and regulations by a special inspector or a deputy boiler inspector;
    (3) if not equipped with a 24-hour computerized monitoring system and automatic controls, has a Grade 1 licensee in attendance at all times that the boiler is in operation; and
    (4) if equipped with a 24-hour computerized monitoring system and automatic controls and is attended by a Grade 1 licensee as follows:
        (i) if not located in a building open for public use, does not require regular visitation, if the licensee:
            1. is responsible for the safe operation of such equipment at all times;
            2. is available to observe the monitoring equipment or devices and make necessary adjustments at least once every 24 hours; and
            3. maintains a daily inspection log . . . .

The first question presented in this case is whether the Act requires every shift supervisor and Control Room supervisor at defendant's plant to have a Grade I license. Defendant agrees that the Act requires an employer subject to the provision of the Act to have the operation of boilers overseen by a Grade I stationary engineer. To that end, defendant has designated the operations manager, Lester Combs, who does hold a Grade I license, to perform the oversight responsibilities.[2] Combs is able to perform this responsibility from his office because the systems he is overseeing are computerized. Defendant contends that this is sufficient to comply with the provisions of the Act. Plaintiff claims, on the other hand, that the oversight responsibility can be performed only by a shift supervisor Control Room supervisor that has a Grade I license.

Defendant's position is correct. When the statutory language contained in section 6.5-302(e)(4) is parsed, it is clear that (1) if the boilers in the Control Room is "equipped with a 24-hour computerized monitoring system," and (2) if the defendant's facility in which the boilers are located is not "a building open for public use," all that is required is that a Grade 1 licensee "is available to observe the monitoring equipment or devices and make necessary adjustments at least once every 24 hours" and that she or he "maintain[] a daily inspection log." The evidence on the summary judgment record establishes that the boilers in the Control Room are equipped with a 24-hour computerized monitoring system, that the operations manager (or, in his absence, the person designated by the operations manager to oversee the system) has a Grade 1 license, and that the operations manager or his designee is available to observe the monitoring equipment and make adjustments at least once every 24 hours.[3]

---

[2] In Combs' absence, Combs is required to designate another Grade I licensee to perform the oversight function.
[3] In his memorandum opposing defendant's summary judgment motion, Plaintiff appears to argue that a Grade 1 licensee must be available around the clock to monitor the boilers. He alleges that a statutory violation occurred because "no licensed Operations Manager or his designee [was} working at 6:30 a.m. on August 12, 2010." Pl's

The only material fact that Plaintiff contests is whether Defendant's plant was "open for public use." Plaintiff's argument on that point is rather frivolous. The evidence establishes that Defendant has in place stringent security procedures that strictly limit access. The plant is gated and surrounded by a barbed wire fence and the Potomac River, is posted against trespassers, and is only accessible through a guard booth that is staffed on a full time basis. Generally, visitors may not come on site except by invitation, must show a valid government photo-ID to the guard, and their point of contact at the plant must authorize the guard to permit them access. Once they are on the premises, visitors may not meander. Periodically, family members of employees are invited to visit the plant and Defendant sponsors school tours from time-to-time. These activities are authorized for the limited purposes of promoting employee morale and community goodwill, and they do not render the plant "open for public use."

Finally, it is to be noted that Defendant's authorization of the operations manager or his designee to oversee the boilers from his office is consistent with the legislative history of the Maryland Stationary Engineers Act. When the Maryland General Assembly was considering changes to the Act in 2005, the Maryland Department of Labor, Licensing, and Regulation wrote a letter to the Maryland House Committee on Economic matters in support of the legislation. In the letter the Department expressly recognized "that the introduction of technology to the operation of boilers has a clear mitigating effect on the traditional requirements that a stationary engineer be in attendance at all times." Accordingly, the Department recognized that "[a]djusted attendance requirements may be implemented without any diminution in the safety factor that full time attendance is designed to provide."

---

Opp. Memo., at 26. Under the Maryland statute, that fact is immaterial if, as Plaintiff does not dispute, the operations manager or his designee (both of whom had Grade 1 licenses) had been available to perform their oversight responsibilities within 24 hours of that time and date.

For these reasons, I find that Defendant's interpretation of the Maryland Stationary Engineers Act is correct and that Defendant properly authorized Combs or his designee to oversee the operations of its boilers. Therefore if, as Plaintiff claims, Plaintiff was discharged because he interpreted the Act as requiring a Grade I engineer to be in the Control Room at all times, his discharge was not in violation of public policy.[4]

III.

Maryland recognizes an exception to the general rule that an at-will employment relationship can be terminated without legal consequence only where the employee was "discharged in the matter that contravenes some clear mandate of public policy." *Adler v. Am. Standard Corp.*, 432 A.2d 404, 467 (Md. 1981). As further elucidated in *King v. Marriott Int'l, Inc.*, 866 A.2d 895 (Md. Cts. Spec. App. 2005), in order for a discharge to be actionable "there must be a preexisting unambiguous and particularized pronouncement by constitution, enactment, or prior judicial decision, directing, prohibiting, or protecting the conduct in question so as to make Maryland public policy on that topic not a matter of conjecture or even interpretation."

For the reasons I have previously stated, I find that defendant's interpretation of the Maryland Stationary Engineers Act is correct and that plaintiff's interpretation of the Act is incorrect. Even if I am wrong in my conclusion, however, the fact that the interpretation of the

---

[4] In support of its motion defendant has proffered the testimony of a representative of the other major power supplier in Maryland – Constellation Power Generation. That representative states under oath that Constellation Power also has determined that it can satisfy the licensing obligation by designating certain licensed officials with the oversight role. Plaintiff has filed a motion in limine as to the proffered testimony. The witness from Constellation Power is not an expert as Plaintiff contends, and his lay testimony is relevant to issues presented in this case. If the other major power supplier in Maryland has interpreted the Maryland Stationary Engineers Act the same way as defendant has interpreted it establishes that, at least, the Act is subject to interpretation and is ambiguous. Further, the proffered witness obviously has knowledge of the practices of Constellation Power, and his testimony does not constitute hearsay as alleged by plaintiff. In any event, even if I were to disregard the testimony of the proffered witness from Constellation Power, I would reach the decision that I have reached in this Memorandum.

Act is debatable itself establishes that public policy that plaintiff alleges was violated by virtue of his discharge is not clear within the meaning of *Adler* and *King*.

IV.

Defendant's final contention is that even if plaintiff was discharged in violation of a clear Maryland public policy, his claim is not cognizable because he was not discharged for making a complaint about breaking the law to outside authorities, for refusing to follow an illegal order or for exercising a specific legal duty in making an internal complaint about the alleged illegal activity.

Defendant's contention appears to be meritorious. It is undisputed that plaintiff did not report the alleged illegal conduct to any outside authority. Likewise, if any illegal activity occurred, it was Defendant who was the wrongdoer, not Plaintiff. His mere presence in the Control Room with unlicensed persons did not render him responsible under the Stationary Engineers Act. Finally, it does not appear that Plaintiff was under any duty to make an internal report of defendant's wrongdoing. The case upon which he principally relies, *Lark v. Montgomery Hospice, Inc.*, 994 A.2d 968, 977 (Md. 2010) involved a complaint that was made under the Health Care Whistleblower's Act. No whistleblower statute is involved in this case.

I need not reach Defendant's argument on this issue, however, because I find that Plaintiff was not discharged in violation of a clear mandate of Maryland public policy. Likewise, I decline, as Plaintiff requests me to do, to certify the public policy question to the Maryland Court of Appeals. I am sufficiently confident in the conclusion that I have reached that I do not believe I should burden the Court of Appeals by asking it to answer a certified question.

A separate order effecting the ruling made in this memorandum is being entered herewith.


Date:   March 30, 2012            /s/
                                  J. Frederick Motz
                                  United States District Judge